**CINCINNATI MILLING MACHINE CO. v. TURCHAN.**

**Civ. A. No. 5941.**

United States District Court
E. D. Michigan, S. D.

April 3, 1951.

John A. Blair, of Harness, Dickey & Pierce, Detroit, Mich., John C. Blair and James L. Black, Jr., of Watson, Johnson, Leavenworth & Blair, New York City, of counsel, for plaintiff.

Thomas S. Donnelly, Robert A. Sloman, Detroit, Mich., for defendant.

LEVIN, District Judge.

The complaint in this action alleges infringement of seven patents. During the hearing complaint with respect to three of them was withdrawn, and subsequent to the close of the hearing, the parties stipulated that the defendant's counterclaim for a declaratory judgment and the motion of the plaintiff to dismiss it be considered at a later time, and that the present determination be limited to the issues raised in connection with the following claims:

1. Claims 13, 15, 18, 24, 33, 38, 46, 57, 60, 67, 72, 73 of Anderson patent No. 1,952,230.

2. Claims 9, 12, 13 of Wall patent No. 1,997,890.

3. Claims 13, 14, 25 of Wall patent No. 2,051,430.

4. Claim 16 of Roehm patent No. 2,068,889.

There are over five thousand pages of transcript, over two hundred fifty exhibits including the prior art references, and extensive briefs numbering hundreds of pages. A study of this material leaves me with the view that the claims of the Anderson patent and the two Wall patents are not infringed by the defendant's devices. They do not embody the structures disclosed and claimed in the patents, nor are they the mechanical equivalents thereof. In view of this holding and the stipulation I do not deem it appropriate to make findings with respect to the validity of these claims and the case of Sinclair & Carroll Co., Inc. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644, is not construed as a mandate that I do so.

Claim 16 of the Roehm patent is found invalid, under the patent statutes, 35 U.S.C.A. § 33, for lack of disclosure.

Plaintiff, Cincinnati Milling Machine Company, is one of the world's largest manufacturers of machine tools. A substantial part of its business is the manufacture and sale of various types of hydraulically controlled milling machines and hydraulic attachments which, when installed on existing machine tools, converts such tools to hydraulic operation for the automatic duplication of irregular surfaces in metal. Defendant Turchan manufactures and sells only such hydraulic attachments for existing machines.

The four patents all relate to the art of mechanically reproducing on a workpiece the shape or form of a pattern. The reproduction is produced by means of a tracer which travels over the pattern and controls the movement of the cutter over the workpiece so that the cutter will respond in its movements exactly to the movements of the tracer. Two generic types of reproduction in this manner are encountered, one known as contouring, as shown in Anderson, and the other known as relief work or die sinking whereby projections and depressions may be reproduced, as shown in both Wall and Roehm.

For many years prior to the issuance of the patents here under consideration milling machines have been employed to shape metal parts. All milling machines have a rotating cutter to remove chips from metal, and usually have three slides, a longitudinal slide that supports and moves the work back and forth beneath the cutter, a cross feed slide that permits crosswise relative movement between the cutter and work, and a vertical slide so that the cutter and work may be moved toward or away from each other. Various mechanisms are used for propelling the slides of the machine, which are either hand or power operated or a combination of both. Under the hand control of a skilled operator these machines, even without auxiliary equipment, are capable of producing work of irregular geometric surfaces, but this is an expensive time consuming operation.

There has always been a need in industry for a machine tool which could automatically duplicate in metal complex shapes, accurately and at low cost. This need was greatly accelerated by the growth of the

automobile and aircraft industries, both of which require irregularly shaped and accurately machined parts in large quantities.

One of the early methods of reproduction utilized hand profilers and cam operated machines, both of which are operated on the same general principle. Hand profilers have a follower held against the pattern by the operator so that the operator may move the tracer over the surface of the pattern. The cutter which is fixed to the same slide as the tracer, produces a similar shape in the work. Hand profilers, however, are arduous to operate because the operator is compelled to hold the tracer against the surface of the master with the same pressure at all times and the difficulty of maintaining this pressure leads to errors in the work. In the cam operated machine a spring is employed to force the tracer and cutter against both the pattern and workpiece so that, as the table moves the pattern under the tracer and the work under the cutter, the cutter is forced to follow the same path in the work as is being traversed by the tracer on the surface of the pattern. These machines, however, do not furnish a solution to the problem of reproducing, without constant and laborious attention, machine parts which meet exacting tolerances.

Long before Anderson received his patent, patents were issued for other devices which reproduce mechanically a pattern form on a workpiece, although not necessarily in metal. In 1902 Bontempi, U.S. Patent 709,388, disclosed a machine whereby the tracer, when moved over the pattern by hand, would, in response to projections or depressions in the pattern, operate a hydraulic valve which would in turn control hydraulic cylinders for effecting relative movements of the cutter with respect to the workpiece. Higgins U.S.Patent 736,726, issued in the same year, shows a pattern mounted on a work table and hydraulic means for effecting relative movement between work and cutter. Pierce U.S. Patent 827,993 issued on August 7, 1906, and British Patent to Lorant, No. 25,939 issued in 1902, were two of several other patents for devices of similar character

which were allowed during the next twenty years.

In 1921 Keller, U. S. Patent 1,379,267, was issued for a pneumatically operated machine for reproducing in metal irregularly shaped parts wherein a tracer responds to the surface of a pattern controlling a valve for regulating the pressure of a fluid (compressed air) delivered to one end of a cylinder.

Shaw, U. S. Patent 1,683,581 and Lochman, U. S. Patent 1,774,279 relate to electrically operated tracers wherein the tracer point, as it travels over the pattern, energizes electrical switches which, in turn, cause the cutting tool to move in the same path as the tracer. Other machines embodying this principle appeared subsequently.

With Anderson, the plaintiff found an automatic hydraulic tracer controlled machine which overcame to a large extent certain deficiencies of earlier devices, and which provided a relatively accurate method of reproducing irregularly shaped metal parts in mass production without the supervision of a skilled operator.

The Anderson patent was applied for on August 1, 1927, and was granted on March 27, 1934. The object of the invention is stated as:

"* * * to provide a milling machine that will automatically cut irregular shapes in metal with only the assistance of a master or template of the desired outline which is to be duplicated.

"A still further object of the invention is to provide a simple automatic profile milling machine adapted to accurately and rapidly follow the template at any desired rate of speed of the cutting tool without the attention of a skilled operator."

The machine disclosed in the patent is an automatic hydraulically controlled milling machine having a tracer continuously biased against the surface of a pattern to maintain rigidly all relative movement between the cutter and the work in a path which is exactly tangent to the surface of the pattern. The tracer is capable of following completely around in a circular path or any portion thereof as the cutter duplicates such path in the workpiece.

March 27, 1934. G. V. ANDERSON 1,952,230

AUTOMATIC PROFILE MILLING MACHINE

Original Filed Aug. 1, 1927 15 Sheets-Sheet 1

Fig.1.

Fig.2.

Inventor

*Gilbert V. Anderson*

By his Attorneys

*Edwards, Sager & Bower.*

March 27, 1934. G. V. ANDERSON 1,952,230

AUTOMATIC PROFILE MILLING MACHINE

Original Filed Aug. 1, 1927 15 Sheets-Sheet 2

Fig.4.

Fig.3.

Inventor
Gilbert V. Anderson
By his Attorneys
Edwards, Sager & Bower

Original exhibit is in color.

As shown in Figure 1 of the patent here reproduced, Anderson mounts a pattern on a sliding work support X and a tractor on a sliding tool support C. The slide C moves to the left and right as viewed in this Figure 1 while the slide X moves toward and away from the reader and accordingly at right angles to the direction of the movement of the slide X. Thus the tool and tracer move as a unit with the slide C, while the work and master move as a unit with the table X. These slides are controlled by hydraulic cylinders A and B, having a piston in each of the cylinders connected to the slides and so arranged that liquid from a constant pressure source may be delivered to the cylinders so as to control the direction of movement of the respective slides. Movement of the slides effected by these hydraulic cylinders A and B is controlled by a series of valve mechanisms contained in the casing Q attached to the side of the machine which controls the hydraulic pressure and flow from pump P. The valve mechanisms are controlled by the deflections of the tracer as it traces the pattern, thus determining the direction and velocity of the resultant motion produced by one or both of the cylinders.

Plaintiff's Exhibit 26, here reproduced, is schematic drawing showing the arrangement of the valve mechanism, consisting of a series of valves interacting upon each other in response to tracer deflections. This valvular arrangement consists of a control valve referred to as a distributor mechanism, having a main and an auxiliary section for the purpose of directing the flow of fluid pressure to the cylinders, a secondary valve H which activates the auxiliary section of the distributor mechanism and a primary valve G which activates this secondary valve H.

The details of the tracer construction are shown in Figure 3 of the patent here reproduced. Tracer head T includes a body carrying an inwardly extending bottom flange to support the disc-like head 15 of the tracer arm 16. The arm rotatably carries a master contractor roller 17 to engage the surface of the pattern during tracing, and this arm can be tilted about any point on the periphery of the disc as a fulcrum. Another disc 18 is formed on the bottom of a rod U in the tracer head, this disc overlying disc 15 to be moved thereby when the tracer arm is deflected, either by tilting or axial movement. The deflection of the tracer arm corrects the relative motion of the slides, which tends to return the tracer arm to the neutral position. The tracer arm is in the neutral position when it is in contact with a straight portion of the pattern, and its axis then forms an angle to the axis of the tracer head. When the tracer arm is deflected toward positive position because the tracer contactor has come into contact with a rising slope, this angle increases. When the tracer arm is deflected toward negative position because the tracer contactor has encountered a falling slope, this angle decreases. The rod U extending from the tracer head is connected by a system of links and levers to the rod R. When rod U is moved upwardly by a positive deflection of the tracer arm, the rod R also moves upwardly. When the rod U moves downwardly by reason of a negative deflection of the tracer arm, rod R also moves downwardly. The lower end of rod R is connected to a valve spool or piston in primary valve G, as shown in plaintiff's Exhibit 26 and in Figure 4 of the patent also here reproduced. A spring 22 is interposed between the bottom end of this valve spool and the bottom of the casing of valve G, which constantly biases the valve element and moves the rod R downwardly.

The primary valve G comprises a casing having a cylindrical bore that receives the valve piston connected to the bottom of rod R. This valve piston includes upper and lower portions 31 and 26 having a close sliding fit with the valve bore. Within the valve casing is an enlarged chamber 25' which connects with upper and lower smaller annular spaces 25 and 30. Disc 27 of the valve piston is disposed in chamber 25'. Space 25 is connected to pipe 7 leading from the tank, forming the source of hydraulic pressure while space 30 exhausts through passage 32 to the sump Q. The diameter and width of the valve chamber

exceeds that of the valve disc and hence the opposite sides of the disc with opposite adjacent sides of the chamber wall form restrictions or resistances 28 and 29 to the free passage of oil. In other words, there is a narrow annular passageway at each edge of the disc and the adjacent edge of the valve chamber through which the oil flows. As the valve disc moves up and down, these resistances change inversely so that the pressure in the valve chamber varies according to the position of the disc, as the primary valve piston and disc move in response to negative or positive deflections of the tracer contactor.

Variations of the pressure conditions within this valve G control the movements of Valve H which is associated with the valve G. As shown in Figure 4 of the patent, a small cylinder on the left end of secondary valve H is connected to the valve chamber of primary valve G by passage 33. A piston 23 in this cylinder is connected to one end of a valve stem 24 which carries secondary valve discs 35 and 37 aligned respectively with grooves 36 and 40 in the casing of the secondary valve. Exhaust passages 42 and 43 leading from the sump are respectively disposed to the left and right of valve discs 35 and 37. High pressure oil is admitted to the secondary valve between the discs 35 and 37 through a port 38, and the flow of oil from passage 38 to pipes 39 or 41 is controlled by the position of discs 35 and 37. At the right end of the secondary valve is an adjustable compression spring 34 which bears against the end of valve stem 24, constantly biasing the valve stem and discs 35 and 37 as well as the piston 23 to the left against the pressure in the chamber of the primary valve. As pressure on the piston 23 increases the valve unit moves to the right against the spring, and as the pressure on the piston is reduced, the unit is moved to the left by the spring. Thus the position of discs 35 and 37 relative to grooves 36 and 40 is determined by the pressure in the chamber in valve G. Since the pressure in valve G is constantly varied by the movement of the tracer, it follows that the position of the discs in valve H

are also varied, thereby shunting the pressure and exhaust liquids to their proper ports. Thus the two valves G and H constitute a unitary control and react instantaneously to tracer deflections directing the flow of pressure fluid from valve H to the auxiliary section of the distributor valve I.

The distributor valve mechanism comprises a rotary valve structure operated by by two hydraulic motors 44 and 45. This valve mechanism, as previously stated, comprises two sections, a main valve and an auxiliary valve. The main valve of the distributor receives its pressure fluid directly from the main pressure tank and controls the main flow. The auxiliary valve is connected to the secondary valve H and controls the auxiliary flow of the distributor valve mechanism. The purpose of· the main valve of the distributor is at all times to so direct the flow of pressure fluid to the main operating cylinders A and B as to give approximately the required direction to· the resultant motion of the tracer and cutter. The purpose of the auxiliary valve with the openings placed at right angles to the main valve is to modify the flow of fluid from the main valve so as to cause it to give exactly the required direction to the resultant motion of the tracer and cutter. The auxiliary valve also acts as a means for regulating the flow of pressure fluid to the hydraulic motors 44 and 45 to cause the necessary rotation at every change in the outline of the pattern as a change in the direction of the resultant force is required. Thus the forces acting on the slides are automatically varied continuously in exact relation to the direction and amount of tracer deflection as dictated by changes in the surface of the pattern being traced by the tracer contactor. The inventor summarizes the operation as follows: "* * * Any displacement of the tracer arm from its neutral position will immediately cause a combined responsive action of the primary and secondary valve in connection with the distributor valve and an immediate change in the direction of the resultant relative motion between the two, such as

would limit the displacement of the tracer arm, and that the resultant gradual rotation of the distributor valve stem would eventually give whatever change in relative motion that it required and cause the tracer arm to return to its neutral position."

### Defendant's Devices

The defendant does not manufacture milling machines but, as previously stated, manufactures and sells hydraulic duplicating attachments for standard type milling machines manufactured by the plaintiff and others. Fundamentally, these attachments embody a tracer mechanism and valves associated therewith, a cylinder controlled by the operation of the tracer valve and the component parts of a hydraulic power unit usually required in a hydraulic system such as a reservoir, pump, sump, and lines.

Throughout the hearing the defendant's accused devices were classified in two groups:

A. One-component devices—Duplicating attachments for operating one slide of the known machine by a hydraulic cylinder responsive to tracer control, the other slides of the machine operating independently of the tracer action by other means incorporated in the existing machine. This type of attachment is generally employed for die sinking and other depth control operations, as shown in plaintiff's Exhibit 67 (Turchan equipped Giddings & Lewis boring mill) and plaintiff's Exhibit 68 (Turchan equipped Becker mill).

B. Two-component devices—Duplicating attachments for operating two slides of the known machine by hydraulic cylinders both allegedly responsive to tracer control. This type of attachment is generally employed for profiling operations—when tracing the circumference of a pattern. Two slides are employed, one known as the contouring or profiling slide, referred to by the plaintiff as the cross slide, and the other the traversing or longitudinal slide. See plaintiff's Exhibit 72 (Turchan equipped Cincinnati vertical mill).

In all the accused machines, the defendant uses the fundamental tracer mechanism shown in the sketch here reproduced, referred to in the hearing as Exhibit 70X. The tracer valve is directly connected to the stationary hydraulic power unit and controls the flow and pressure conditions on the opposite ends of a tracer controlled cylinder. The tracer mechanism and the cutter are affixed together so that they move as a unit. The valve piston in the valve body is pressed downwardly by a spring and is vertically reciprocable in response to any lateral or axial deflection of the tracer arm.

In the one-component group, when the tracer contactor is traversing a straight horizontal surface, the tracer valve is in the neutral position so that the position of the ports will provide a pressure condition in the opposite ends of the hydraulic cylinder to maintain the piston stationary. Whenever the tracer contractor is deflected from its neutral position by a change in the surface of the pattern being traced, the resistances or size of the openings in the tracer valve will be immediately varied inversely to increase the pressure on one side of the piston in the hydraulic cylinder and correspondingly to decrease the pressure on the opposite side, thereby effecting movement of the piston, and thus the cutter, in the desired direction.

HYDRAULIC CYLINDER

Piston

Piston Rod

Oil Line

Oil Line

14

Valve Body

Valve Piston

Spring

16 15 12

11 10

19

PISTON TYPE
TRANSFER VALVE

17

13 18

Tracer Spindle

Exhaust Line

Motor Driven Pump

Pressure Line

Relief Valve

Rel
V

P

HYDRAULIC RESERVOIR

632

In the two-component devices, the defendant's tracer mechanism, as shown in plaintiff's sketch Exhibit 75 here reproduced, comprises an upper and lower section. The lower section is constructed and operates in the same manner as the tracer valve used in the one-component device. It is directly responsive to tracer deflections and controls the profiling slide. The upper section of the tracer unit is connected to the traversing or longitudinal slide. During the tracing operation, it is necessary in traversing a circumference to change the function performed by these slides and the defendant accomplishes this through a manually operated changeover, or, as it is sometimes called, a selector valve, which is connected to both the upper and lower section of the tracer valve. By a manual rotation every ninety degrees of the selector valve, the fluid pressure connections of the cylinders may be changed and either cylinder may become connected to the lower section of the tracer. There is also incorporated in the changeover valve an independently controlled reversing valve which is connected to the traversing or longitudinal slide, permitting the operator to retrace any portion of the circumference, if desired, during the operation. The structural details of this changeover valve appear in the patent granted to Turchan, U.S.Patent No. 2,391,492, issued November, 1942.

The hydraulic circuit in such two-component devices, as shown in Exhibit 75, operates substantially as follows: The pressure line 13 running from power unit 4 has two branches, one branch going to the lower section of the tracer valve then to the changeover valve and to one end of the profiling cylinder which is moved in response to tracer deflections. The exhaust from this cylinder returns through the changeover valve and back to the tracer. The second branch of the power source goes from the power unit through the reversing valve to the changeover valve and then to the traversing cylinder. The exhaust from this second cylinder returns to the changeover valve, and through the reversing valve and through the upper section of the tracer.

*Discussion of Infringement*

■ The claims measure the grant of a patent. Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332. The claims, however, are always to be read in the light of the specifications, not to expand them, but to ascertain their true meaning. Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132.

Plaintiff demonstrated to the court the operation of various types of tracer controlled machines, which it manufactures and sells commercially. Exhibit 38 is alleged to be a diagrammatic representation of the fundamental tracer control circuit embodied in whole or in part in all of plaintiff's tracer controlled machines. It was received in evidence and demonstrations were had, over the objections of the defendant, upon the undertaking to the court that this exhibit and the machines demonstrated would be shown to be in accordance with the patents in suit. After a study of the patents in issue and the other evidence the court is of the view that this exhibit does not represent the tracer and hydraulic circuit disclosed in the Anderson patent or the other patents in suit. Nor does the court agree with plaintiff that the structure shown in this exhibit is the same "for all practical purposes" as that disclosed in the Anderson patent.

■ The plaintiff's comparison of its commercial machines with the defendant's accused machines is not the true test of infringement. In order to determine whether a patent is infringed, a comparison must be made of the accused machines with the teachings of the patent in suit, as disclosed by the specifications and claims. Hartford-Empire Co. v. Obear-Nester Glass Co., 8. Cir., 39 F.2d 769.

The claims of the Anderson patent in issue are: 13, 15, 18, 24, 33, 38, 46, 57, 60, 67, 72 and 73. They fall generally into the following classifications:

1. Those which are directed to a description of the tracer mechanism including a tracer head, a tracer arm and hydraulic means controlled by the tracer mechanism for controlling the profiling operation of:

633

Original exhibit is in color.

the machine. Claim 13 [1] is representative of this group.

2. Those directed toward the description of an automatic profile milling machine which combines a tracer and cutter, a work table with a pattern mounted thereon, hydraulic means for providing relative motion between the cutter and work table of both slides simultaneously, which hydraulic means are actuated by deflections of the tracer due to contact between the tracer and pattern. Claim 15 [2] is representative of this group.

3. Those directed to a hydraulic actuating system for controlling two slides of a machine tool having a main and auxiliary circuit and means for rendering the two circuits interchangeably effective along one or the other of the paths of movement of the two slides. Claim 24 [3] is representative of this group.

4. Those directed to a part of the valvular chain and in particular valves G and H and their interaction upon each other. Claim 57 [4] is representative of this group.

■ These are all combination claims and with the exception of claim 13, admittedly contain no new elements. If there be innovation it is in the combination. As to claim 13, plaintiff contends that the element which reads "a tracer arm the axis of which is inclined to the axis of the tracer head when in its neutral posi-

tion," is a new element. Defendant denies this and asserts that the inclination of the tracer arm when in its neutral position is not an inherent characteristic of the tracer arm, nor is it due to any novel construction, but that it is inclined to the axis of the tracer head only because the pattern pushes it over into that position. Assuming for the purpose of this discussion that this is a new element, the burden still remains upon the plaintiff to show infringement of the entire combination set forth in claim 13 of which the tracer arm is one of the constituent elements of the combination. As stated in Huntman Stabilizer Corporation v. General Motors Corporation, 3 Cir., 144 F.2d 963, 965: "A combination is a union of elements, some of which may be old and others new or all old or all new. It is the combination which is the invention." Citing Leeds & Catlin Co. v. Victor Talking Machine Co., 1909, 213 U.S. 301, 29 S.Ct. 495, 53 L.Ed. 805.

The Anderson patent is not a pioneer patent. Reference to the history of the art indicates that the use of a tracer mechanism to activate a valve which controls hydraulic cylinders for moving the slides of a machine was not new at the time the Anderson patent was granted. Plaintiff here relies upon a word by word correspondence of the claims in suit with the defendant's devices to support the al-

1. "13. The combination in an automatic hydraulic profile milling machine of a tracer mechanism comprising a tracer head and a tracer arm, the axis of which is inclined to the axis of the tracer head when in its neutral position and hydraulic means for controlling the profiling operation of said machine controlled by movements of said tracer arm toward and away from its neutral position."

2. "15. In a profile milling machine provided with a tracer and cutter, the combination of a work table with a pattern mounted thereon, hydraulic means for providing relative motion between the cutter and work table in one direction, hydraulic means for providing relative motion between the cutter and the work table in any direction different from the first direction, means actuated by deflection of the tracer due to contact between the tracer and the pattern to operate said first and second recited means simultaneously whereby the direction of

relative movement is varied in accordance with said deflection and means to automatically maintain continuous contact between the tracer and the pattern."

3. "24. An hydraulic actuating system for controlling a machine tool having two slides movable in angularly related paths, including a main circuit and an auxiliary circuit, and means for rendering the two circuits interchangeably effective primarily along the one or the other of the paths of movement of the two slides."

4. "57. In a fluid control mechanism, the combination with a pressure source, and conduit means for conveying fluid under pressure therefrom, of coupled resistances jointly restricting the flow of fluid, means for inversely varying the effect of said resistances whereby the differential between existing pressure adjacent the respective resistances is varied, and pressure responsive means actuated by said differential variations."

leged infringement. If the court adopts such a construction in order to support plaintiff's contention of infringement, the claims in suit may also read upon the prior art to which reference has been made earlier and would therefore be invalidated. However, when read in the light of the specifications and drawings, they are not violative of the patent statutes.

All the claims, with the exception of claim 57, must be read to include the primary and secondary valves G and H, hydraulic motors 44 and 45 and the main and auxiliary parts of the distributor valve as essential elements of the structure disclosed in these claims. Claim 57 which is drawn to a sub-combination, is to be read so as to include valve G and the pipe 7, coupled resistances 28 and 29 in valve G, disc 27 of valve G and piston 23 of the valve·H as essential elements of the structure disclosed in this claim. See Figure 4 of the patent.

These elements in all the foregoing claims are, in the words of the claims, the "hydraulic means" or "pressure responsive means" and they are integral parts of the combination claims without which the structure disclosed could not perform the function for which it was designed and for which the patent was granted—a completely automatic conturing operation.

These "means" are not all embracing as the plaintiff insists but cover only the means or elements of the combination disclosed by Anderson or its mechanical equivalent.

"Whatever novelty exists in the combination of elements set forth in the claims relied upon resides in the 'means' clause described as the last element of each claim, and this, under well-settled authority, must be limited to the element in the combination as expressed in the specifications. An inventor cannot by the mere use of the word 'means' appropriate any and all kinds of mechanism or devices which may perform the specified function, or any other mechanism or device than that which is described in the patent or which is its mechanical equivalent." Ford Motor Co. v. Gordon Form Lathe Co., 6 Cir., 87 F.2d 390, 391, citing cases.

It was the automatic feature of plaintiff's invention; to wit, the ability to trace completely around a· 360 degree surface without touching a valve on the machine by the use of the specific valvular combination employed, which was repeatedly stressed before the Patent Office as the advance over the prior art. In prosecuting the application of Anderson, the following statement, among others, was made to the Patent Office examiner to emphasize the novelty of the particular valvular combination disclosed over the prior art references: "There is certainly no suggestion anywhere in any of these references of the feature of a tracer controlled mechanism in which there is a primary valve connected with the tracer, a secondary valve which is operated by that primary valve and a distributor valve such as the valve mechanism I of Anderson which is controlled by the secondary valve and which in turn determines the relative motion between the carriage and work table. As has been pointed out in the Anderson application, his distributor valve makes possible the proper allocation of the total available hydraulic actuating medium between the control motor mechanism for the movable slides or carriages such that a continuous conforming relative movement of the cutter and work is produced which is in a path—not as with Keller and the references of the prior art, an irregular approximation of—but is actually a reproduction of the path or contour determined by the template or pattern."

The defendant does not use plaintiff's tracer valve construction or its distributor mechanism and associated parts in either its one or two-component devices and the construction and operation of defendant's devices in both groups are substantially different from that disclosed in the Anderson patent. In Anderson when the tracer contactor is deflected from a neutral to a negative or positive position, the flow conditions set up in the primary and secondary valves G and H automatically cause the distributor valve to become operative, resulting in its rotation and a proportioning of the fluid to the two cylinders A and B, thus determining the direction of relative movement of the two slides.

In the defendant's one-component devices, as long as the tracer follows a straight horizontal path, the tracer valve remains in neutral position as it does in Anderson. But when the tracer contactor is deflected to a negative position, following a downward slope in the pattern, the valve in taking this negative position causes the piston in the hydraulic cylinder to move downwardly because of the pressure in the top side of the cylinder, so that the cutter will follow a similar downward course. Conversely, where the tracer contactor is engaging a rising slope, a positive position, the piston in the hydraulic cylinder is moved upwardly because the greater pressure is now in the bottom of the cylinder and the cutter will follow a similar course. In short, any deflections of the tracer contactor are immediately reflected in the flow and pressure conditions on the opposite ends of the tracer controlled cylinder, and defendant performs a complete operation without any intervening mechanism such as plaintiff's distributor mechanism or its mechanical equivalent.

Plaintiff ingeniously illustrated by drawings that with certain changes in the Anderson structure the distributor valve mechanism could be eliminated and the device operated as a one-component control to resemble more closely defendant's devices. There is considerable doubt that the plaintiff's device would then operate, but, in any event, it would appear that plaintiff may not do this and still have the benefit of a patent monopoly.

"A combination is always an entirety. In such cases, the patentee cannot abandon a part and claim the rest, nor can he be permitted to prove that a part is useless, and, therefore, immaterial. He must stand by his claim as he has made it. If more or less than the whole of his ingredients are used by another, such party is not liable as an infringer because he has not used the invention or discovery patented. With the change of the elements the identity of the product disappears." Schumacher v. Cornell, 96 U.S. 549, 554, 24 L.Ed. 676.

With respect to the two-component devices, it is plaintiff's contention that defendant has simultaneous control of both cylinders, as shown in Anderson, because deflections of the tracer contactor which cause variations in the pressure conditions of the lower portions of the tracer valve also affect the upper section of the tracer and corresponding feed rate of the traversing cylinder. Defendant insists that deflections of the tracer contactor which affect the lower portion of the tracer valve, control only the profiling or cross slide and have no effect upon the traversing slide which moves at a constant feed rate. He urges that the tracer deflections control the movement of only one cylinder at a time and that the action of the traversing cylinder exhausting back through the upper portion of the tracer valve does not constitute a control thereof. I am of the view that it is immaterial whether the defendant controls the traversing slide by the pressure or exhaust method, it is nonetheless controlled. However, I find that this does not resolve the question of infringement in favor of the plaintiff, for the defendant's changeover valve in ths group of devices is not the mechanical equivalent of plaintiff's distributor mechanism as their construction and function are substantially different.

In plaintiff's device, the distributor mechanism, through hydraulic motors 44 and 45 and valves G and H, automatically proportions the fluid between the two slide moving cylinders to give them the resultant direction of movement, and by means of hydraulic motors 44 and 45 automatically changes the function of the slides, whereas in defendant's device the sole purpose of the changeover valve is to shift the functions of the slide moving cylinders by manual control only, so that either the cross feed slide or the longitudinal slide may be connected to the lower portion of the tracer valve at any given time during a tracing operation. In the defendant's structure there can be no automatic operation of mechanism to proportion the fluid between two cylinders operating at right angles to each other because there is no such automatic proportioning mechanism in the defendant's structure.

*Wall patents 1,997,890, 2,051,430*

The Wall patent '890 was granted on April 16, 1935, on an application filed December 12, 1933, and relates to an im-

April 16, 1935. E. L. WALL 1,997,890

UNIVERSAL TRACER

Filed Dec. 12, 1933 4 Sheets—Sheet 1

Fig. 2.

Fig. 5.

WITNESSES

INVENTOR
Edmund L. Wall
BY
ATTORNEYS

provement in a tracer used in a duplicating machine. The purpose of the invention is "to provide a tracer for controlling a pressure fluid in accordance with the profile of a model, said fluid variably operating a cutter which in turn operates upon the work."

The patent is concerned with various structural aspects of the tracer mechanism, as shown in Figures 2 and 5 of the patent here reproduced. The tracer mechanism includes an elongated tracer arm 43 which is mounted at the end of an extension of the tracer body. A ball bearing is carried in this extension and supports the tracer arm for sliding and rocking movement. The tracer arm is universally mounted in such a way that very little pressure exerted axially or laterally at its lower end is sufficient to lift the arm on the one hand or rock it on the other. The upper end of the tracer arm carries a ball 66 which is received in a spherical socket formed at the lower end of the arm 63. A disc 56 is formed on the upper end of this arm and has an annular upstanding flange 62 which Wall calls an anvil. The bottom of the disc is supported by an annular flange providing a fulcrum about which the arm 63 can rock. The upper edge of the anvil supports the valve spool 58 and accordingly as the anvil rocks with the arm, the valve spool is lifted.

For the purpose of catching and diverting any oil which might leak downwardly beween the valve spool and its sleeve, Wall provides an annular skirt or umbrella which depends from the bottom of a disc which is substantially greater in diameter than the tracer arm and overlies a cuplike structure which is screwed into the bottom of the tracer head. Thus any oil leaking down the valve sleeve will flow down along the skirt and drop into a catch basin from which it may be withdrawn.

The valve spool and its associated parts constitute the movable valve structure. The valve is a sliding type valve having two pressure fluid openings. The liquid flows into the casing through one and flows out of the other. Reference to the specifications show that Wall contemplated a bypassing type of valve as shown on p. 4 of the patent. When the tracer rides upon an eminence on the pattern, there is a displacement of the movable valve structure, and communication is established between the inlet and outlet ports. Pressure fluid is by-passed from one to the other through the valve structure, as is plain in all of the forms of the invention. The force of the pressure fluid stream is diminished in so far as its action in driving the tracer and cutter toward the pattern and work is concerned, permitting a weight to pull the tracer and cutter away. In other words, when the pressure fluid stream is diverted, the weight will predominate and so move the tracer and cutter away from the pattern and work. On the other hand, when the pressure fluid stream is permitted to work, the weight is overpowered and the tracer and cutter are urged toward the pattern and work. The result is a reproduction of the eminence in the work.

Further details of the manner of operation of this tracer mechanism are best shown in the other Wall patent in suit, 2,051,430, in which the tracer is incorporated. It was granted August 18, 1936, on an application filed the same day as the application for the Wall '890 patent and is primarily concerned with the conversion of a vertical spindle milling machine into an automatic duplicating machine by attaching the tracer mechanism shown in patent '890 in combination with other elements to enable such machine to duplicate automatically the form of a master in a work-piece.

The object of this '430 patent is to provide an attachment whereby hydraulic and mechanical raising of a table which carries the pattern and the workpiece may be effected in such manner that the hydraulic mechanism will not interfere with the mechanical mechanism, thus enabling a milling machine to perform a die sinking and modeling operation by the use of the attachments shown in such Wall patents.

The mechanism is embodied in a knee and saddle type vertical mill, as shown in Figures 1 and 7 of the patent here reproduced. The main elements of the machine compromise the base 2 and a column 4 which carries the knee 5. The knee in turn carries the saddle 6 movable toward and

Aug. 18, 1936. E. L. WALL 2,051,430

UNIVERSAL DIE SINKING ATTACHMENT FOR VERTICAL MILLING MACHINES

Filed Dec. 12, 1933 3 Sheets-Sheet 1

Fig.1.

WITNESSES

INVENTOR
Edmund L. Wall
BY
Munn, Anderson, Stanley, Foster & Liddy
ATTORNEYS

Aug. 18, 1936. E. L. WALL 2,051,430

UNIVERSAL DIE SINKING ATTACHMENT FOR VERTICAL MILLING MACHINES

Filed Dec. 12, 1933 3 Sheets-Sheet 3

Fig. 7.

WITNESSES
Lawrence O Hawkins
J. V. Schrott

INVENTOR
Edmund L. Wall.
BY
Munn, Anderson, Stanley, Foster & Liddy,
ATTORNEYS

from the machine column. The saddle has guideways on which the table 8 may slide to the right and left. Thus the table may move crosswise in horizontal paths. Up and down movement of the table toward and from the cutter carried by the machine column is ordinarily effected by a manually operable screw jack 16. Wall in converting this machine to an automatic duplicator immobilizes this screw jack and provides a pair of cylinders 24 on opposite sides of the knee, attaching the piston rods of these cylinders to the knee of the machine.

To supply high pressure oil to his control circuit, Wall uses a tank 45 which acts as a sump from which the oil may be forced into the system by a motor driven pump. The oil thus forced into pipe 34 flows through a flexible connection 39 to the tracer mechanism. A branch line 36 leads from pipe 34 to the bottom of the left-hand cylinder and a pipe connects the bottom ends of both cylinders. As high pressure oil flows to the bottom of these cylinders, their pistons will force the knee, and accordingly the table, upwardly toward the cutter. Gravity effects movement of the knee and table downwardly from the cutter.

This movement of the table is controlled by the tracer mechanism. When the tracer is deflected during operation there is a corresponding change in the variable resistances in the valve structure between the pressure and exhaust lines. When this resistance overcomes the weight of the table, the cylinders will lift the table in accordance with the pressure exerted. When the valve resistance decreases, a part of the flow passes through the tracer valve to the sump thus reducing pressure in pipe 34 and the pressure at the bottom of the cylinders, causing the table to drop by its own weight. Thus the cylinder pressure is varied depending on the tracer deflection.

*Infringement re the two Wall patents*

Claims 9, 12, 13 of the Wall '890 patent [5] and claims 13, 14 and 25 of the Wall '430 patent [6] are alleged to be infringed by the defendant's devices.

5. "9. A tracer valve casing having pressure fluid openings, a valve structure in the casing to control said openings, a tube extending from the casing, means to move the valve structure endwise, said means including an extension tracer bar partly occupying the tube and extending therefrom, and a ball bearing mounted at the approximate end of the tube slidably receiving the bar and providing a fulcrum for its rocking motion."

"12. A tracer valve casing having pressure fluid openings, a movable valve structure in the casing to control communication between said openings, a disc having an anvil to support the valve structure, a tracer shank pendent from the disc, a tracer tip carried by said shank for engagement with a pattern beneath the shank, and means to divert fluid escaping past the anvil from the shank to prevent its reaching the pattern."

"13. A tracer valve casing having pressure fluid openings, a movable valve structure in the casing to control communication between said openings, a disc having an anvil to support the valve structure, a tracer shank pendent from the disc, a tracer tip carried by said shank for engagement with a pattern beneath the shank, means to divert fluid escaping past the anvil from the shank to prevent its reaching the pattern, and means comprising an annular drip flange on the nether side of the disc."

6. "13. Means for converting a vertical spindle boring mill into a modeling machine, said mill having a vertically movable and crosswise slidable work table and a stand, a tracer mechanism including tracer means which is caused to vibrate by the profile of a pattern carried by the table during crosswise sliding thereof, means attached to a part of the stand for firmly supporting the tracer mechanism over the work table, fluid pressure actuated moving means to raise the table and its carried work toward a cutter on the spindle, and a control valve for said fluid pressure moving means subject to vibrations of the tracer means and by its responses in said fluid pressure moving means operating to vary the force of said fluid pressure moving means.

"14. Means for converting a vertical spindle boring mill into a modeling machine, said mill having a vertically movable and crosswise slidable work table to carry the work, an extension on the table to carry a pattern, a tracer mechanism and means by which it is firmly supported over the extension, said mechanism including tracer means which is caused to vibrate by the profile of said

643

The claims of the '890 patent are drawn to a tracer valve structure for controlling a pressure fluid in accordance with the shape of a pattern.

The claims of the Wall '430 patent are drawn to an attachment to convert a verticle spindle milling machine into a modeling or duplicating machine, and to provide pressure fluid mechanism for raising and lowering the knee, saddle and table of the known machine which are under the automatic control of a tracer mechanism.

The claims in both Wall patents are combination claims which do not contain. any new elements. As was said in connection with Anderson, if there be novelty it lies in the combination. These claims must be confined to the structure shown in the specifications.

The defendant's tracer valve mechanism embodied in the Becker vertical mill, plaintiff's Exhibit 68, is constructed and operates in the same manner as pictured in plaintiff's Exhibit 70X referred to in the Anderson discussion. Defendant has a tracer valve with pressure fluid openings as called for by the claims of the '890 patent, but the arrangement of the ports or openings in defendant's valve are different and the openings are employed for a different purpose. In defendant's structure the tracer mechanism is used to control the delivery of liquid to both sides of the cylinder so that the slide is positively moved hydraulically in both directions, whereas in Wall the valve is used solely to control pressure for moving a slide in one direction only. In Wall, as indicated, the function of the tracer valve is to control the pressure by diminishing. the fluid or bleeding off in such a manner as to regulate and effect changes of pressure in the pipe connections leading to the hydraulic cylinders. The pressure fluid that goes to the tracer valve never gets to the hydraulic cylinder but is exhausted after it leaves the tracer, and the valve structure functions as a by-passing valve for permitting the escape of pressure fluid from the main line to the exhaust.

The valve structure common to both Wall patents could not be substituted for the Turchan valve as it functions in an entirely different manner. They both control hydraulic circuits but they control them in a different way. The detailed construction is different and the circuits are different.

The Supreme Court has consistently adhered to the controlling principles to be considered in the application of the doctrine of equivalents set out in the early case of Winans v. Denmead, 1853, 15 How. 330, 14 L.Ed. 717. The tests there stated have been applied and these principles have been restated during the intervening years in many opinions. See Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136, and Willet Manufacturing Co. v. Root Spring Scraper Co., 6 Cir., 55 F.2d 858, both of which cases consider patents for devices operated by hydraulic means.

In the recent case of Graver Tank & Manufacturing Co., v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, Mr. Justice Jackson, speaking for the court, reaffirmed with emphasis the application of these principles: " * * *. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish

pattern during sliding of the table, automatically controlled fluid pressure actuated moving means for vertically moving the table during said sliding, and a control valve for said fluid pressure actuated moving means subject to the vibrations of the tracer means and by its responses in said fluid pressure means operating to variably cause raising and lowering of the table."

"25. A duplicating machine comprising two slides movable in angularly related paths for supporting the work and a master pattern, a cutter for the work and a tracer for contacting and moving over the pattern, valve mechanism controlled by the tracer for moving the work and the pattern respectively towards and away from the cutter and tracer in directions transverse to the angular paths of movement of the said slides, and separably operable means cooperating with the tracer for automatically controlling the movement of the work to the cutter."

substantially the same result, they are the same, even though they differ in name, form or shape.' Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935, * * *. The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement."

 As previously stated, the claims considered in the Anderson and the two Wall patents are found not infringed by the defendant's devices.

*Roehm patent No. 2,068,889*

Application for this patent was filed September 11, 1935, and granted January 26, 1937. This patent relates "to a milling machine having three directional manual or power control of relative movement between the tool support and work support by means of which plain milling operations may be performed, to which may be selectively added automatic tracer control of one of the directional movements whereby contouring operations may be performed." The machine has two horizontal slides moving at right angles to each other as shown in Figure 4 of the patent. The third slide is a vertical slide which carries the tracer and the cutting tool. Each of these units is provided with manual and power control means moved by a fluid operable mechanism and each of the slides is provided with a hydraulic cylinder. The admission of fluid pressure to the cylinders is controlled by a servo valve regardless of whether manual or power control is utilized.

The patent contains eighteen claims. Some of these are confined to the manual and power control operation of the servo motors, which control the movement of the slides, while others include, in addition, control of the vertical slide by means of the tracer mechanism. The only claim in issue is claim 16 which reads as follows:

"In a hand die sinking machine, the combination of a pair of relatively movable members mounted in guideways having their axes lying in planes normal to one another, a cutting tool mounted on one of said members, and means to support a workpiece and a pattern on the other, a tracer supported for engagement of said pattern, servo motor means operatively connected for effecting relative movement between said members universally in one plane including a pair of manual controls respectively connected to said servo motor mechanisms, one of which is adapted to control movement in one direction in said plane and the other in a second direction in said plane, and means controlled by the tracer while in contact with the pattern for controlling relative movement between the tool and the work in a direction perpendicular to said plane."

This is a combination claim and consists of several elements, two of which include:

a. " * * * a tracer supported for engagement of said pattern, and * * *"

b. "means controlled by the tracer while in contact with the pattern for controlling relative movement between the tool and the work * * *."

The only reference to the tracer mechanism and its manner of operation is shown in the specifications at page 6, lines 17 to 40 of the patent as follows: "When it is desired to use the machine as a tracer controlled machine for profiling or die sinking an additional bracket 310 is applied to the power bracket and bolted on the face 311 as shown in Figure 15. This bracket contains an interlock control valve 312, shown in Figure 16, and a hydraulic motor 313 and a tracer head unit 314. The connections of these various valves are automatically effected by removing the plate 246 and substituting therefore the plate 279. The interlock valve 312 serves to automatically connect the tracer control valve 314 to the cylinder 238 whereby the tracer will automatically control the up and down movement of the head. When the tracer is undeflected the valve plunger 315 will be automatically control the up and down movement of the head. When the tracer is undeflected the valve plunger 315 will be automatically

shifted to the left from the position shown to thereby interconnect the servo control valve 253 for control of the cylinder 238. The particular manner of operation of this valve and the connections thereto are more fully described in copending United States application 30,744, filed July 10, 1935, and further description thereof is not believed to be necessary."

It appears from the evidence adduced at the hearing that the copending application serial 30,744, heretofore referred to, was subsequently issued as the Campbell patent U.S. No. 2,039,294 and is also owned by the plaintiff. The Campbell patent is concerned with an automatic pattern controlled machine tool, having manually operable means for moving the tracer toward the work through servo motor means and automatic means for rendering the manual control inoperative upon engagement of the tracer with any object. As stated by the inventor, "this invention contemplates means for automatically effecting this transfer and is so designed that the manual control is always subordinated to the tracer control so that whenever the tracer is deflected from its free position or is in engagement with a pattern the tracer will automatically assume control and at the same time render the manual control ineffective. A comparison of the Roehm tracer controlled mechanism as shown in Figure 16 of the patent, with the Campbell tracer construction, shows that they are not similar structures and the one may not be substituted for the other. The tracer housing of Campbell as shown in Figure 7 of said patent, has five pipes communicating with it as compared to seven pipes communicating with the tracer housing shown by Roehm. It is not shown in either patent how the Campbell tracer could be attached to the Roehm structure and hydraulic circuit disclosed in Figure 16. There is nothing in the specifications or the claims which discloses the manner of operation of the elements required for the use of the tracer valve, or how the function which is claimed for these elements is achieved. And it may be added that no witness at the hearing was able to state that he could find any disclosures in either the Roehm or Campbell patents, indicating how the hydraulic motor 313 of Roehm could be connected with the tracer to make it operative, nor is the court aware that any machine has actually been constructed in accordance with the teachings of claim 16 of the Roehm patent. The description of the patent is so uncertain that one is unable, except by independent experiments, to ascertain with certainty the structure claimed by Roehm.

"* * * while drawings may be referred to for illustration and may be used as an aid in interpreting the specification or claim, they are of no avail where there is an entire absence of description of the alleged invention, or a failure to claim it. The statute requires the patentee not only to explain the principle of his apparatus and to describe it in such terms that any person skilled in the art to which it appertains may construct and use it after the expiration of the patent, but also to inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not. * * *" Permutit Co. v. Graver Corporation, 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163. See also Suczek v. General Motors Corporation, 6 Cir., 132 F.2d 371.

As has been stated earlier, claim 16 of the patent is declared invalid for lack of disclosure under the patent statutes, 35 U.S.C.A. § 33.

An order consistent with the determinations here set out may be presented for signature.