James M. CHURCH, as Trustee, as substituted for Leonard H. Church, as Trustee, deceased, for Otto Carter Berry, Plaintiff-Appellant,

v.

CHRYSLER CORPORATION, Defendant-Appellee.

No. 15074.

United States Court of Appeals Sixth Circuit.

Aug. 5, 1965.

Dwight F. Bickel, Boise, Idaho (W. Parker Craig, Cleveland, Ohio, on the brief), for appellant.

Don K. Harness, Detroit, Mich. (Arthur W. Dickey, Harness, Dickey & Pierce, Detroit, Mich., on the brief), for appellee.

Before WEICK, Chief Judge, CECIL, Circuit Judge, and BOYD, District Judge.

CECIL, Circuit Judge.

This action was brought in the United States District Court for the Northern District of Ohio, Eastern Division, by Leonard H. Church, as trustee for Otto Carter Berry. Jurisdiction of the Court is invoked by Sections 1332 and 1338, Title 28, U.S.C. Berry was the inventor in a piston construction for use in automobile engines and for which patent No. 2,262,132 was issued to him on November 11, 1941. This patent will be referred to as the Berry patent or the patent in suit. Leonard H. Church was the assignee in trust of all of Berry's rights in the patent, including all his rights, privileges and interest in the license agreement hereinafter mentioned. Upon the death of Leonard H. Church, James M. Church became the successor trustee and was substituted as plaintiff. James M. Church will be referred to herein as plaintiff.

Chrysler Corporation, hereinafter referred to as Chrysler, and Thompson Ramo Wooldridge, Inc. were named as defendants. Under agreement dated March 19, 1940, Berry granted Thompson Products, Inc. an exclusive right and license throughout the world, together with the right to grant sublicenses, to manufacture, use and sell pistons covered by the Berry patent. On June 2, 1951, Thompson Products, Inc. granted Chrysler a nonexclusive license to manufacture, use and sell pistons embodying any of the inventions covered by the Berry patent. Chrysler agreed to pay royalties on all pistons covered by the patent which it manufactured. Thompson Products, Inc. became Thompson Ramo Wooldridge, Inc., and on January 8, 1960, about one month before this action was begun and about fourteen months after the expiration of the patent in suit, it assigned all of its rights arising out of its exclusive licensing agreement of March 19, 1940, to the plaintiff. Thompson Ramo Wooldridge, Inc. was made an involuntary defendant because it would not join as a plaintiff. Subsequently, it was dismissed as a defendant by stipulation for the reason that it had no interest in the litigation.

The plaintiff seeks an accounting and to recover royalties on pistons alleged to have been manufactured by Chrysler under its license agreement with Thompson Products, Inc. It also seeks to recover damages for an alleged infringement of the Berry patent by Chrysler on pistons which it purchased from Sterling Aluminum Products, Inc. Chrysler claims that it paid royalties on all of the pistons which it manufactured under its license agreement and that the pistons it purchased from Sterling Aluminum Products, Inc. did not infringe the Berry patent. The trial judge found against plaintiff on both claims and the plaintiff appealed.

The question presented here is whether certain pistons in question manufactured by Chrysler and pistons purchased by Chrysler from Sterling Aluminum Products, Inc. infringe Claim 2 of the patent

in suit. To decide this question, it is necessary to interpret the language of the claim and to determine whether parts of the accused pistons are mechanical equivalents of the structure disclosed in the Berry patent. The trial judge interpreted the language of the claim to be limited to constructions embodying a central vertical rib, hereinafter discussed. (Supplemental findings of fact of trial judge.) He also held that the Chrysler pistons did not function through mechanical equivalents of the Berry patent.

When Berry applied for his patent, he entered an already crowded art. His purpose was to solve a problem caused by unbalanced temperatures and varying coefficients of expansion of the materials composing the piston and piston chamber in the internal combustion automobile engine. His announced intent was to devise a piston that would "fit well irrespective of the temperature of the head." Berry combined the use of various old elements previously used in other patented devices to provide a very successful piston. While the validity of the patent in suit was in question before the District Court, the trial judge did not decide this issue and it is not now before us.

In his patent application, Berry said:

"Pistons have been made with ribs under the head to strengthen the head and the wrist pin bosses. Pistons have also been made with expansion control bands in the piston skirt, as in the piston shown in Butler Patent No. 1,532,121, but in none of these was the rib as deep and as heavy as the one that I use to produce the 'hoop-stretching' action, and in none of them was a deep rib used in combination with an expansion control band in the piston skirt. While some of the ribs in those pistons caused some 'hoop-stretching' action, not one of them was intended to be or was capable of making the 'hoop-stretching' action counterbalance the part of the thermal expansion of the skirt that resulted from the hot head. No one realized that it was possible to secure such a bal-

ance and thus make the piston fit well irrespective of the temperature of the head. That is my discovery, and a piston proportioned so that it will function in that way, is my main invention."

Simply stated, Berry devised a piston which used an "interior heat transfer means" to uniformly transfer the heat from the piston head (where the explosion occurred) down to the bottom of the piston (the piston skirt), so as to provide effective control over the expansion of the piston inside the cylinder. The "skirt", oval in shape when cold, was "hoop-stretched" by this uniform transfer of heat applied to the sides of the piston into a more rounded object and, even though the piston and the piston chamber walls had different coefficients of expansion, the piston would function smoothly no matter what the temperature of the engine. This, then, was Berry's contribution to the piston art. The specific "interior heat transfer means" shown in the patent drawings and specifications is a "deep vertical rib". Berry does not specifically limit his claims to this rib, but neither does he suggest any other type of heat transfer means.

The accused pistons were developed some thirteen or fourteen years after the Berry patent was issued, at a time when the automotive industry began to shift to higher compression, higher horsepower engines. The older, higher, thin-walled pistons could not hold up under the stress of the new engines and new pistons had to be designed. The natural outgrowth of this development was a shorter, thicker-walled piston that weighed no more, if not less than, the older low compression pistons. The accused pistons function smoothly without the use of a deep vertical rib.

The alleged infringement turns first on the construction of Claim 2 in Berry's patent application:

"In a metallic hollow piston of the type including a head and a skirt joined to the head in the regions of the pin bosses and separated from the head in regions at right angles

to said pin bosses, providing the skirt with relatively flexible cylinder contacting portions at said separated regions adapted to be hoop-stretched, interior heat transfer means connected to the piston head top and connected to the skirt in substantially the plane of the pin bosses, and expansible by the high temperatured heat of the piston head top to pull in at right angles thereto said flexible cylinder contacting portions for hoop-stretching the top of said skirt at substantially the plane of its junction with said head, so as to balance out the thermal expansion due to the high temperature of the piston head of the top end of the skirt, said skirt being of oval cross section and having a horizontal ferrous control band embedded therein having a considerable lower rate of thermal expansion than the material of said skirt, so that as the piston is heated from a uniform low to a uniformly higher temperature the major diameter of said skirt through the flexible portions will expand at a rate less than that of the material of said skirt, but more than that of said ferrous band."

The trial judge interpreted the above language, in the light of Berry's other claims and specifications, to equate "interior heat transfer means" with the deep vertical center rib used by Berry in his pistons. Since the accused pistons have no vertical center rib, it is obvious that the accused pistons are non-infringing on Claim 2 in form and construction. In the landmark case of Royal Typewriter v. Remington Rand, 2 Cir., 168 F.2d 691, at page 693, cert. den. 335 U.S. 825, 69 S. Ct. 50, 93 L.Ed. 379, the Court, spoke of broadly-stated patent claims thusly:

"From the beginning courts have held that, since the claim is the measure of the monopoly, it must advise the public of its scope, and may not be stated in terms of ends or purposes, for that would extend the monopoly to all contrivances which would accomplish the same results, and these might owe nothing whatever to the patentee. * * * It is true that a boundary cannot be drawn with precision; and the draftsman of claims is always in something of a dilemma—the dilemma which has led to the very 'doctrine of equivalents' itself. He must pick out those elements of the manifold which together make up the invention, for the statute requires: 'he shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery.'[8] On the one hand, if

[8] Section 33, Title 35 U.S.C.A.

he confines himself rigidly to those elements as they appear in the specifications, he deprives the patent of any practical value, because it is always, or almost always, possible to change the form of these as they appear, and yet cull the full advantage of the discovery. On the other hand, if he too much abandons the elements as they are disclosed, he will not 'particularly point out * * * the part * * * or combination which he claims': i. e. he will have so far generalized the disclosure, that the combinations of any elements which will effect the same result will be covered. The patent will then pro tanto stifle progress in the art and be invalid. It is impossible in practice to emerge from this embarrassment without some measure of compromise; the elements as they appear in the claims must be clearly enough identified with elements as they appear in the manifold to be 'substantially' limited by their description, verbal and pictorial. Yet the claims must be given enough scope to cover 'substantially similar' variants. It is always a question of degree, and courts have differed, and always will differ, as to the allowable latitude in a given instance. * * * *"

The legal interpretation of a patent claim is sometimes a very close question. This is particularly true in the case before us. Counsel for Chrysler contends that the claim in question is limited to the deep-centered vertical rib shown in the drawings and described in the specifications. While there is strong argument in support of this position of counsel, we cannot say, as a matter of law, that the claim must be so limited. However, we cannot, as a matter of law, give this claim the broad, general interpretation asserted by plaintiff. It is clear that the ambiguous general statement, "interior heat transfer means", cannot be interpreted to give monopoly protection to every conceivable means of transferring heat from the top to the bottom of a piston, whether it is specifically designed to do so or not. In Cincinnati Milling Machine Co. v. Turchan, 6 Cir., 208 F.2d 222, this Court said:

> "We have held that where the novelty that exists in a combination of elements set forth in the claim, resides in the means, the claim must be limited to such means as are disclosed and illustrated in the specification. An inventor cannot by the mere use of the word 'means' appropriate any and all kinds of mechanism which may perform the specified function or any other mechanism or device than that which is described in the patent or which is its mechanical equivalent, * * * The word 'means' is itself an indefinite statement and as such must be interpreted in the light of the patent drawings and specifications, * * *" 208 F.2d at 225.

Even though the patent, as construed by the trial judge, has not been copied in form, the patentee can also show infringement by proving that the alleged infringer has copied the patent in substance. This is what is known as the "doctrine of equivalents", first announced in Winans v. Denmead, 15 How. 329, 330, 56 U.S. 329, 330, 14 L.Ed. 717 (1853). The Court said, at page 342:

> "Where form and substance are inseparable, it is enough to look at the form only. Where they are separable; where the whole substance of the invention may be copied in a different form, it is the duty of the courts and juries to look through the form for the substance of the invention—for that which entitled the inventor to his patent, and which the patent was designed to secure; where that is found, there is an infringement; and it is not a defense, that it is embodied in a form not described, and in terms claimed by the patentee."

It is incumbent upon the patentee, however, to show that the accused infringing device is the equivalent of the patented device. In the case before us, the patentee has offered meager proof of equivalence. He has testified that the accused pistons function smoothly. He has offered testimony to show that a thicker head will carry the heat more uniformly down to the bottom of the piston. On the other hand, defendant offers proof that the important "hoop-stretching" is effectuated by force exerted under the skirt rather than from above. Defendant has also offered proof that the absence of a deep vertical center rib greatly reduces "hoop-stretching". Thus, there is nothing more than conjecture to show that the thicker head of the accused piston performs the equivalent function of the deep vertical center rib of the Berry patent. Nor are we willing to accept counsel's suggestion that the thickened head can be likened to a myriad of deep center vertical ribs extending around the entire interior of the piston head. With the paucity of proof offered by plaintiff the finding that the accused piston is not the equivalent of the Berry patent cannot be said to be clearly erroneous, and therefore will not be disturbed by this Court. In Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605

at page 609, 70 S.Ct. 854, at page 857, 94 L.Ed. 1097 (1950), the Court said:

"A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence. It is to be decided by the trial court and that court's decision, under general principles of appellate review, should not be disturbed unless clearly erroneous. Particularly is this so in a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience."

Since the accused pistons have not been found to infringe upon the Berry patent, plaintiff is not entitled to royalties or damages for their use by defendant.

The judgment of the District Court is therefore affirmed.