**TOP-SCOR PRODUCTS, INC., Plaintiff,**

v.

**The H. C. FISHER COMPANY and Harry C. Fisher, Defendants.**

**Civ. A. No. C 64–388.**

United States District Court
N. D. Ohio, E. D.

Feb. 11, 1966.

Motion for Reconsideration Denied
March 18, 1966.

B. D. Watts and Thomas E. Fisher, Cleveland, Ohio, Malcolm A. Litman, of Fishburn & Gold, Kansas City, Mo., for plaintiff.

William C. McCoy, Cleveland, Ohio, for defendants.

## MEMORANDUM

GREEN, District Judge:

This action was brought by plaintiff to recover for alleged infringement of United States Patent No. 2,508,393, issued to Edward B. Jaeger on May 23, 1950 for a "Shortening." [1] As stated in the patent specifications:

> This invention relates to an improved shortening for use in the production of bread dough, cake batter, and the like; and in extension contemplates not only a shortening per se, but doughs, batters, and the like, including the novel shortening and the method for their production and the baked products produced therewith.

Defendants are charged with infringing the said patent by the manufacture and sale of compositions known as Fisher's Fresh'ner or Fisher's Special Fresh'ner or Fisher's Super Fresh'ner. These compositions are designed for use by bakers in a bread dough system.

Defendants moved the Court for a summary judgment, on the basis that the accused compositions do not infringe plaintiff's patent. The motion was set for oral argument, at which time defendants' counsel placed sole reliance on one alleged distinguishing feature between defendants' products and plaintiff's patent.

In ruling on this motion the Court has therefore determined to consider only that ground urged at the oral hearing, and has not considered the other matters set forth in plaintiff's original written motion.

The crux of this matter revolves around the issue of the "thermal stability" of the patented compositions and defendants' products. The term thermal stability, as used herein, relates to the propensity of the compositions not to separate into different phases when heated.

Defendants contend that their products are thermally unstable—that is, that they separate into different phases under heat

---

1. Plaintiff has purchased the patent from the inventor's widow.

—and that the patent covers only a thermally stable compound, one that will not so separate under heating and in the temperature range normally encountered in the baking process. It is on this basis that defendants contend that their products cannot be held to infringe plaintiff's patent.

There is adequate evidence before the Court to establish that defendants' products separate on heating at 130 to 140 degrees Fahrenheit into a water phase and a solid organic phase which immediately melts to a liquid organic phase. The sole question is whether plaintiff's patent reaches such a composition.

The claims of plaintiff's patent simply describe the formulation of the shortenings claimed thereunder, and have no reference to the thermal stability of the said compositions. Defendants contend, however, that in the presentation of the patent to the Patent Office the inventor and his solicitor argued that the claimed compositions were inherently thermally stable, and thus an express recital in the claims of thermal stability is not necessary to impress such a limitation upon the scope of the claims. Plaintiff denies that any such limitation can be read into the claims, based upon the proceeding before the Patent Office.

This matter of the weight to be accorded to representations made to the Patent Office, and the effect thereof upon the issued patent, is the principal point in controversy herein.

■ The rule in this Circuit appears to be well established that reference may be had to the history of the patent before the Patent Office to assist in determining the scope thereof. A patent should be construed in the light of its history in the Patent Office. Nickerson v. Bearfoot Sole Company, 311 F.2d 858, 862 (CA 6, 1962). The Court of Appeals for this Circuit has stated:

It was vigorously contended below that patent office arguments are merely preliminary negotiations and that file wrapper history to ascertain the meaning of claims is looked upon with dis-

favor. In Wiegand v. W. Bingham Company, 6 Cir., 106 F.2d 546, 548, we fully explained that we have not so tightly closed the door to inquiry upon the precise concept of the inventor, measured by his own representations, with citation of precedents. Cincinnati Milling Machine Co. v. Turchan, 208 F.2d 222, 227 (CA 6, 1953).

See also, Thabet Mfg. Co. v. Kool Vent Metal Awning Corp., 226 F.2d 207, 210 (CA 6, 1955); Firestone Tire & Rubber Co. v. United States Rubber Co., 79 F.2d 948, 955 (CA 6, 1935); Sturgis v. Franklin Oil Heating, 26 F.Supp. 628, 631–632 (D.C.S.D.Ohio, 1939).

■ While in most instances the foregoing rule has been applied in cases involving construction of claims which had been amended to meet prior Patent Office rejection, the rationale of the rule is equally valid when the question before the Court is in what manner the applicant distinguished his invention over the prior art, and the novelty which he ascribed to it, in order to secure allowance of the patent claims.

The history of this patent before the Patent Office does reflect some claim amendment, but the meaning of the precise language of the amended claims is not the principal issue. It is the general inventive concept of the claimed compositions which is the prime issue, and in that respect the file history is informative.

The exhibits before the Court reflect that all of the patent claims, as amended, were rejected by the Patent Examiner as unpatentable over the prior art. The decision of the Examiner was reversed by the Patent Office Board of Appeals, and the patent allowed. The decision of the Board of Appeals will be considered hereinafter.

In the specifications of plaintiff's patent the following statements are found:

Whatever the order of addition of the ingredients and however the ingredients are mixed, batters and doughs as heretofore produced have heretofore

contained free fat and more or less free moisture which cannot unite in baking. *Free fat under baking temperature will be reduced to oil,* which will oversaturate the batter or dough ingredients, thereby retarding the baking so that the baking cannot be efficiently concluded before the expansion action of the carbon dioxide gas released by the leavening agent, such as the baking powder, has diminished to such an extent as to be ineffective. \* \* \*

\*     \*     \*     \*     \*

Now in accordance with this invention, it has been found that if the fat used as shortening in a batter or dough be incorporated with a glycerol or a propylene glycol monoester of an edible fatty acid with a substantial amount of moisture, through the medium of an emulsifying agent, to form a shortening, a modification of the other ingredients of the mix, including any added moisture, *and especially of the fat and moisture,* will take place with the result that in the baking operation there will be less moisture released through oven heat evaporation, insuring more moisture in the baked product and the fat, which is desired to be controlled, will be prevented from breaking down to an oil, all of which results in a baked product having superior characteristics to that produced with the use of heretofore known shortenings.

\*     \*     \*     \*     \*

Batters and doughs according to this invention will include the novel shortening, *which will afford control of the fat desired to be controlled* and of the moisture both within itself and within the mass of the batter or dough. \* \* \* (Emphasis added).

As the Court interprets plaintiff's patent specifications, the inventor states that prior art shortening separated the oil and moisture phases on heating to baking temperatures, and that when the oil separated out the baking process was retarded, permitting evaporation of the moisture. He then states that with his shortening this separation does not oc-

cur, the moisture is retained, and a superior baked product results.

This same position was taken by the inventor and his solicitor before the Patent Office.

In relation to an amendment being made to the claims, plaintiff's solicitor stated:

The relatively large proportions of esters that are used by the applicant serve to change the characteristics of the fat by uniting with it so as to raise its melting point \* \* \*.

\*     \*     \*     \*     \*

The applicant's shortening material may be mixed with water and then heated and the water will not separate out. During this heating a white opaque liquid is produced. In the product of Harris, water will separate out and a layer of oil will float on top of the water after this heating.

Mr. Jaeger submitted an affidavit to the Patent Examiner concerning baking tests which he conducted. The affidavit concerned six different cakes which were baked, certain of which utilized his new shortening, while others used prior art shortenings. In each instance the cakes baked with the new shortening contained a higher moisture content than those using the prior art shortenings. Mr. Jaeger also stated that one cake using an old shortening:

\* \* \* had a raw bottom layer of uncooked batter about 1/16th inch thick showing that the lard, after being melted by the heat of baking, separated from the batter and sank to the bottom.

Notwithstanding Mr. Jaeger's efforts to demonstrate the novelty of his shortening, the Patent Examiner gave a final rejection to all claims presented. The application was then taken before the Patent Office Board of Appeals.

The Court considers certain of the representations made to the Board of Appeals highly significant. This is so not only because of what they represent on their face, but more so because they are consistent with the theory expressed in the patent specifications, although in

greater detail and more readily understandable language.

In his brief to the Board of Appeals the solicitor for Mr. Jaeger stated:

The present invention relates to an entirely new form of shortening. The Examiner admits that the proportions of ingredients are new. He has not realized that the entire approach is also new.

\*   \*   \*   \*   \*

All previous shortening materials when heated to their melting points (around 130° F) melted to a fluid oil. This oil fluidity of the shortening was considered to be inherent. \* \* \* Applicant's material on the other hand is designed so that it will not melt at the melting point of the fat ingredients in it, and will not even melt to a clear oil at the temperatures met with in the baking of the cake, nor will the water phase separate.

Because of the fact that applicant's shortening does not melt to a clear oil, it is able to hold air and thus build up the volume of the cake or batter. At the same time applicant by incorporating moisture in large quantities in his shortening, not only is able to accomplish the production of a mass which is semi-solid at advanced temperatures, but incorporates needed extra moisture in the final product and greatly improves his cake while using very much less shortening material.

\*   \*   \*   \*   \*

The present invention is a wholly new approach to the shortening problem. Applicant's mass, which does not revert to an oil but stays in a white creamy mass even at boiling, produces better baked materials when using as little as one-quarter the amount of fat. The entrapment of air by the semi-solid material builds up volume and improves texture.

In another presentation to the Board of Appeals the solicitor stated:

Our major premise in our brief, which is not challenged, is that previous shortening materials melted to a fluid oil when heated to their melting points, but that applicant's material is designed so that it will not form a fluid oil at the melting point of the fat, and will not even melt to a clear oil at cake baking temperatures, nor will the water phase separate.

In its decision the Board of Appeals stated:

The Examiner and appellant have sufficiently described the alleged invention and further description here is unnecessary. *Appellant's shortening is claimed to have high temperature stability in contrast to prior art shortening.* There results a baked product asserted to be superior in texture and exemplifying unexpected results of a large saving in shortening, higher water content, high sugar content and what is asserted to have been impossible heretofore, the use of lard in a high sugar content cake. (Emphasis added).

The Board then reviewed the references cited against the application by the Examiner, and went on:

Appellant has on record an affidavit in which there is set forth data in regard to cakes baked from identical mixes utilizing Harris' shortening and applicant's shortening. The results were much in favor of appellant's resulting cake showing better texture, a saving in shortening, higher moisture content, and that lard surprisingly was enabled to be used in a high sugar content cake.

We have considered the arguments pro and con and are convinced that the references are not a satisfactory teaching of the invention claimed. The decision of the examiner is reversed.

The entire reversing opinion is rather brief, and it appears to this Court that the baking tests specifically referred to therein were a substantial factor in the Board's determination.

Based on the foregoing matters of record, this Court is convinced that the key to the invention of plaintiff's patent, and its advancement over the prior art,

resides in the thermal stability of the compositions described in the patent claims. The Court is of the opinion that the record clearly reflects that the thermal stability of the claimed compositions was recognized by the inventor, his solicitor and the Patent Office Board of Appeals as an inherent quality of the claimed compositions, and the absence of specific claims of thermal stability in the patent claims is not destructive of that fact.

In considering this patent and its history, no matter where one begins the path inevitably leads back to thermal stability of the new compositions as the basic foundation of plaintiff's patent.

If we begin by looking to the issued patent itself, the specifications make a plain statement that in prior art shortenings the free fat and moisture would not unite in baking, but that in the patented shortening the free fat is prevented from breaking down to an oil, as a consequence of which a superior baked product is produced.

If we look for an explanation of why the patented shortening produces a better baked product, the answer is supplied in clear terms by the inventor's solicitor in the proceedings before the Patent Office.

The new shortening was stated to produce a better baked product because it was able to hold air and build up the volume of the cake. It also produced a superior product because it incorporated and retained additional moisture. How did it achieve these desirable results? By remaining in a semi-solid state, even at baking temperatures. Why did it remain in a semi-solid state? Because it was designed not to melt at the melting point of the fat ingredients in it—because it was thermally stable.

If the principal point of focus is the decision of the Board of the Patent Appeals, we find the Board singling out "high temperature stability in contrast to prior art shortening," producing a superior baked product, as the claimed basis of the patent's invention. We further find the Board relying on the inventor's baking tests as evidence of improvement over the prior art.

Looking then to the baking tests, as reflected in the Jaeger affidavit, we find that the inventor demonstrated the preparation of a superior baker product using his new shortening. The affidavit does not discuss how the new shortening produced these improved results, although there are some oblique references to unfavorable results with prior art shortenings attributable to a separation of the moisture and fat contents thereof. The nature of the improved product, as reflected in the affidavit, is consistent with those qualities of baked goods which the patent specifications and the inventor's solicitor both stated would result as a consequence of the thermal stability of the new compositions.

Plaintiff contends herein that statements made by the inventor's solicitor before the Patent Office representing a misunderstanding on his part of the true nature and scope of the invention, or arising from confusion on the part of the solicitor, should not be read into the patent claims so as to impress an unwarranted limitation thereon. In this case, however, the statements of the solicitor are entirely consistent with the patent specifications, the representations of the inventor himself and appear to have been accepted by the Board of Appeals in allowing the patent. Under such circumstances the Court cannot ignore these representations, but should recognize them as a vital part of the patent's history and accord them their proper weight.

It is the Court's conclusion that U. S. Patent No. 2,508,393 covers compositions as described in the claims thereof which have an inherent thermal stability under temperatures normally encountered in the baking process.

Coming now to an examination of defendants' accused products, the Court finds that defendants' alleged infringing products are not thermally stable, in that they separate into a water phase and a solid organic phase which immediately melts to a liquid organic phase on

heating to 150 degrees Fahrenheit, which is less than normal baking temperatures. As such, these products lack the thermal stability necessary to respond to plaintiff's patent and therefore are not an infringement of the said patent. Plaintiff has contended that defendants' products have greater thermal stability than those references cited by the Patent Examiner during the prosecution of the patent. That is not the issue herein. The controlling question is whether defendants' products have the degree of thermal stability contemplated by plaintiff's patent.

█ The Court will order the entry of summary judgment in defendants' favor finding no infringement of plaintiff's patent by defendants' products known as Fisher's Fresh'ner or Fisher's Special Fresh'ner or Fisher's Super Fresh'ner, and entering final judgment on the complaint in defendants' favor.

On Motion for Reconsideration

This Court has heretofore granted a motion for summary judgment by defendants, finding no infringement of plaintiff's patent by the products manufactured by defendants. Plaintiff has moved for reconsideration of that ruling, citing sixteen alleged errors by the Court in ruling thereon.

The Court does not believe that it is necessary to pass upon the assignments of error individually. Generally speaking, looking to the basic foundation of the assignments of error, they break down into two broad categories. Pervading several assignments of error is the theory that the Court gave undue weight to the proceedings before the Patent Office, and based thereon construed the patent without regard to the patent specification and inventor's affidavit and in the absence of expert testimony thereon. The other claim of error which is reflected in several of the assignments is that the Court erred in failing to make a distinction between the thermal stability of the claimed compositions of plaintiff's patent per se and the alteration in thermal stability of a dough due to containing the patented compositions.

With regard to the matter of the file wrapper history herein, plaintiff argues that it is incumbent upon the Court to take expert testimony on the scope of the patent, where the subject matter is highly technical and where portions of the file wrapper are inconsistent with one another. As an abstract proposition that may be so. But in this case plain uncomplicated statements were made to the Patent Office setting forth the alleged inventive concept of the new compositions and, in this Court's opinion, the said statements were relied upon by the Patent Office in the granting of the patent.

█ The Supreme Court has recently stated that it is well-settled law that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. The Supreme Court also stated that claims which had been narrowed to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (Feb. 21, 1966). This Court believes that these statements of the Supreme Court, and the pertinent decisions of the Sixth Circuit Court of Appeals cited in the original memorandum, fully support the Court's ruling that a file wrapper history, and particularly arguments on behalf of the inventor therein, may be looked to in order to determine the scope of an invention when the question before the Court is in what manner the applicant distinguished his invention over the prior art, and the novelty which he ascribed to it, in order to secure allowance of the patent claims. The Court sees no rational basis for permitting resort to a file wrapper history when a patent claim had been narrowed by written amendments to meet a patent examiner's rejection and denying resort to a file wrapper history as an aid to construction of the patent when the ap-

plicant or his solicitor argued a limited scope to existing patent claims in seeking to overcome a similar examiner's rejection.

This then leads to the second principal issue raised by plaintiff, that by relying on the file wrapper history the Court misconceived the basic inventive concept of the patent.

The Court held that the claims of the patent in suit are limited to a shortening composition that is per se thermally stable. Plaintiff argues that the Court erred in failing to recognize that the patent extended to compositions which alter the thermal stability of a dough due to containing the potential compositions. Plaintiff further contends that the Court disregarded the patent specifications in arriving at the decision rendered herein.

The Court believes that plaintiff's argument herein is not based on a proper premise. Plaintiff argues that the invention of the patent resides in improving baked products. Plaintiff then proceeds one step further, and argues that the baked products are improved in that the combination of the patented shortenings with a dough or batter produces a total mixture with greater thermal stability than that known to the prior art. It is at this point that plaintiff stops. The Court believes, and has so found, that the inventor secured his patent by convincing the Patent Office that his claimed shortenings per se had a thermal stability not found in the prior art which in turn produced a greater thermal stability in the overall mixture of dough and shortening which in turn resulted in an improved baked product. It is this final step in the chain of causation which plaintiff fails to recognize in advancing its arguments herein.

It is this Court's opinion that the patent specifications clearly indicate that it is the claimed shortenings themselves, acting upon a dough, which produce the improved baked products relied upon by the inventor in seeking allowance of the patent, and that the statements of the inventor's solicitor were explanatory of,

and consistent with, the patent specifications.

The patent specifications start out:

This invention relates to *an improved shortening for use* in the production of bread dough, cake batter, and the like; *and in extension* contemplates not only a shortening per se, but doughs, batters, and the like, *including the novel shortening* and the method for their production and the baked products produced therewith. (Emphasis added).

As defendants point out, the patent claims encompass only the shortening itself.

The patent specifications then state that in the prior art it has been customary to add to the dough mix fat or shortening as such and also a moisture ingredient. Thereafter the specifications state that with the prior art the free fat and free moisture do not unite in baking and that the free fat at baking temperatures will be reduced to an oil, which will oversaturate the batter or dough ingredients, producing various undesirable results.

The specifications shortly thereafter state that with the new shortening:

* * * a modification of the other ingredients of the mix, including any added moisture, and especially of the fat and moisture, will take place with the result that in the baking operation there will be less moisture released through oven heat evaporation, insuring more moisture in the baked product *and the fat, which is desired to be controlled, will be prevented from breaking down to an oil.* * * *

* * * * * *

* * * Batters and doughs according to this invention *will include the novel shortening*, which will afford control of the fat to be controlled and of the moisture *both within itself* and within the mass of the batter or dough. * * (Emphasis added).

From the foregoing it appears that in describing the invention of the patent the patentee described it in terms of a novel

shortening per se, which produced a modification of the baking process when used in a batter or dough mix. The basis upon which this modification of the other ingredients results, however, is not clearly spelled out in the specifications. It is this information which the Court believes is plainly reflected in the file wrapper history.

The inventor's solicitor, at various times, stated to the Patent Office:

The relatively large proportions of esters that are used by the applicant serve to change the characteristics of the fat by uniting with it so as to raise its melting point and enable the fat, for example lard, to trap and hold air and to permit marked reduction of the total amount of shortening used from that heretofore required. Thus, in a high sugar content cake, lard can be used as the fat by employing the compositions of applicant's invention. The amount of fat can be reduced by as much as 75% and the quality of the baked product will be improved in all of its characteristics.

* * * * * *

Applicant's material on the other hand is designed so that it will not melt at the melting point of the fat ingredients in it, and will not even melt to a clear oil at the temperatures met with in the baking of the cake, nor will the water phase separate. Because of the fact that applicant's shortening does not melt to a clear oil, it is able to hold air and thus build up the volume of the cake or batter. At the same time applicant, by incorporating moisture in large quantities in his shortening, not only is able to accomplish the production of a mass which is semi-solid at advanced temperatures, but incorporates needed extra moisture in the final product and greatly improves his cake while using very much less shortening material.

* * * * * *

Our major premise in our brief, which is not challenged, is that previous shortening materials melted to a fluid oil when heated to their melting points, but that applicant's material is designed so that it will not form a fluid oil at the melting point of the fat, and will not even melt to a clear oil at cake baking temperatures, nor will the water phase separate.

The Court firmly believes that the foregoing representations made to the Patent Office, read together, established the following claim on behalf of the inventor: A new form of shortening has been developed which does not separate into a water and oil phase at baking temperatures (is thermally stable); it is this feature which distinguishes the new shortening from the prior art; because of this characteristic, when the new shortening is used in a dough mix it remains semi-solid and thereby retains added moisture and air; that as a consequence of this reaction an improved baked product results.

The Court sees no conflict between this theory argued to the Patent Office and the specifications of the patent itself. The former is simply an amplification and explanation of the latter.

There is additional evidence in the file wrapper that the composition on which a patent was sought was a shortening per se. In distinguishing the compositions on which the patent was sought from the prior art the applicant's solicitor referred to tests in which the applicant's composition and a prior art shortening were both heated in water, to determine if they would separate into different phases. The inventor himself, in an affidavit, referred to the development of superior shortenings. Samples of applicant's shortening and a prior art shortening were submitted to the Patent Office.

All of the foregoing is consistent with the statement in the patent specifications that the invention is of an improved shortening and the fact that the claims of the patent cover various formulations for shortenings.

Notwithstanding the foregoing, plaintiff argues that the grant of the patent by the Patent Board of Appeals was not

784

based on considerations of thermal stability, but rather on the ingredients and proportions of the shortening as set forth in the patent claims.

The opinion of the Board of Appeals specifically states:

Appellant's shortening is claimed to have high temperature stability in contrast to prior art shortening. There results a baked product asserted to be superior. * * *

The Board thereafter specifically considered and rejected as anticipatory prior art Harris Patent No. 2,132,416. The Harris patent was distinguished as not disclosing the emulsifying agents of plaintiff's patent and indicating greatly different proportions of ingredients. It was the product of the Harris patent which was cited by the inventor's solicitor as used in the test to demonstrate the thermal stability of the new shortening as against the prior art. The Board of Appeals also made specific mention of baking tests conducted using the new shortening and the Harris shortening, which were much in favor of the new shortening.

To say that the grant of the patent by the Board of Appeals was as a consequence of a recognition of the production of an improved baked product produced by the ingredients and proportions of the compositions of the patent claims, one would have to ignore the remainder of the file history. Throughout the prosecution of the patent it was argued to the Patent Office that the claimed compositions had a per se thermal stability not found in the prior art which produced in turn a reaction on a dough or batter mix which resulted in an improved baked product. This theory was specifically recognized, and the baking tests reflective thereof cited, by the Board of Appeals in the granting of the patent.

In the assignments of error plaintiff contends that there is no evidence to support the Court's finding that defendants' products lack the thermal stability necessary to respond to plaintiff's patent. Plaintiff admitted at the oral hearing on the motion for summary judgment that defendants' accused products separated into a water phase and a solid organic phase which immediately melts to a liquid organic phase on heating to 150 degrees Fahrenheit, which is less than normal baking temperatures. In light of such admission, no further evidence is required.

Plaintiff's motion for reconsideration is denied.